Texas & Gulf Railway Company v. First National Bank of
Carthage et al.

Decided October 23, 1907.

**1.—Carrier—Bill of Lading—Delivery—Custom.**

In a suit by a shipper against a railroad company for the value of goods delivered by the railroad company without presentation or surrender of the bill of lading, and so lost to the shipper, evidence considered, and held to show that the company surrendered said goods upon the personal guaranty of the person to whom they were delivered to indemnify the company, and not because of a certain custom of dealing with the shipper, and hence the shipper was not estopped by such custom, and the railroad company was liable.

**2.—Special Charge—Omission of Issue.**

A requested charge which omits a material issue, is properly refused.

**3.—Charge—Preliminary Statement.**

An inaccurate expression occurring in the preliminary portion of a charge is not ground for reversal when it is apparent from the whole charge that the jury were not misled by such expression.

**4.—Statement of Facts—Delay in Filing—Fault of Trial Judge.**

Where a statement of facts, through the misapprehension of the trial judge as to the date upon which the time expired, was filed one day too late, it will be considered on appeal.

Appeal from the District Court of Panola County. ·Tried below before Hon. Richard B. Levy.

*Walker & Chamness* and *Young & Stinchcomb,* for appellant.

*Brooke & Woolworth, W. R. Anderson, J. C. Brooke* and *T. P. Young,* for appellee.

JAMES, Chief Justice.—The First National Bank of Carthage, Texas, brought this suit against the Texas, Sabine Valley & N. W. Ry. Co. for the value of 93 bales of cotton, alleging in substance that it delivered the cotton to the railway company for shipment from Carthage to Timpson, and to be delivered to order of the plaintiff at Timpson; that appellant failed to so carry and deliver the cotton, "but on the contrary so carelessly and negligently acted in regard to the same . . . that said 93 bales of cotton were wholly lost to plaintiff, to its damage the sum of $3,543.88."

The Texas, Sabine Valley & N. W. Ry. Co. answered. Appellant, The Texas & Gulf Ry. Co., appeared and alleged that it had succeeded to the property and liability of the former railway company, and was allowed to be substituted as the defendant.

Certain parties were eliminated from the case, and the trial occurred with the First Nat'l Bank of Carthage as the plaintiff and The Texas & Gulf Ry. Co. as original defendant, and the Geo. H. McFadden & Bros. Agency, composed of the parties named in the answer of the defendant and impleaded by it. In this answer it was pleaded that the McFadden Agency had agreed to hold defendant harmless in connection with the subject matter of this

suit, and asked for judgment over against said agency in the event defendant was held to be liable. Judgment was against defendant, and defendant was awarded judgment over against the members of said agency. No issue was made as to defendant's right to recover against the McFadden Agency in case defendant was adjudged to be liable.

The first, second and third assignments of error insist that defendant was, upon the evidence, entitled to the peremptory instruction which it asked; and that, for the same reason, the court erred in overruling the motion for new trial. Under these assignments the proposition is: "By the course of dealing between the plaintiff and W. E. Ross concerning the cotton that W. E. Ross purchased by checks upon the plaintiff's bank, the said Ross was made the agent of the plaintiff, in that he was authorized to receive all of said cotton, have it compressed and classified, and was permitted to sell it to whatever purchaser he chose and for whatever price he might agree to take, and procure through bills of lading for it and, therefore, the said W. E. Ross was authorized to receive the cotton referred to in the plaintiff's petition, and the appellant company is not liable for the same."

The testimony disclosed that W. E. Ross was a cotton buyer from yards and wagons in Carthage and Timpson, paying for same by drafts on the First National Bank of Carthage and the Cotton Belt Bank of Timpson. He sold to the Geo. H. McFadden & Bros. Agency of Shreveport, and others. The cotton in question was bought by him at .Carthage and paid for by his overdrafts on the Carthage Bank, who took as their security the bills of lading therefor over defendant's road to Timpson, where it was sent for compression, classification and sale by Ross. These are known in the record as the local bills. They recited that the cotton was received of W. F. Ross for delivery to the order of the First National Bank of Carthage or its assigns at Timpson, Texas.

It appears that when Ross sold the cotton to others than the McFadden & Bros. Agency, the procedure was that he would get Rembert, the railway's agent at Timpson, to issue him a bill of lading to shipper's order and notify the purchaser at destination, and that he (Ross) would write on these bills showing that the cotton was received from him to be delivered to shipper's order and get the agent to sign for them, and he would attach to it a draft from himself to the consignee and would take it to the Cotton Belt Bank, at Timpson, to be sent to the First National Bank of Carthage. Upon Ross receiving the bill of lading from the agent, he would give him an order on the Cotton Belt Bank, who had the local bills, to turn them over to the agent, who would go and get them. This was the usage during the season pertaining to cotton in which the Carthage Bank was interested and sold to others than the McFadden Agency.

In sales to the McFadden Agency its agent, or Ross, prepared bills of lading for the particular cotton, which the agent would sign, and deliver to McFadden's men, and Ross would write a note to the Cotton Belt Bank telling them to deliver the local bills, which

the agent would get on the order.   Ross testified in this connection that when he delivered the cotton to the McFadden Bros. Agency he gave an order to the railway agent for the local bills.   That he would first give Mr. Rembert (the agent) such order on the Cotton Belt Bank, covering that particular cotton.   That he would then instruct the bank that he had delivered that cotton to the agency and that the local bills were ready to be surrendered to the railway company.   That is what he would do if the local bills of lading had been issued.   "When the sale was to others than the agency, I would get Mr. Rembert to give me the bill of lading to shipper's order and I would give him an order for the local bills.   I would notify the bank as soon as I could walk up there with the through bills of lading."   Rembert testified:  "I would get a note from him to the Cotton Belt Bank to deliver me the bills of lading.   The order was generally just a note to the cashier to deliver me the bills of lading, and I would present it at the bank and get them.   Sometimes when I was up-town, or if it was not convenient for him to come, I would go to his office, and he would give me a written order for the bills, or he would sometimes have the bills of lading there."

In this connection we may state that the agent testified that "McFadden Bros. have not shipped much over our line.   I knew Mr. Vick only that one time and one other time he came in and I signed a bill of lading.  ·  I signed two that I remember during the season."

When Mr. Vick (McFadden's agent) wished to get this cotton, Ross was at Carthage and the railway agent would not deliver it. Ross, it seems, was left in control of all cotton at Timpson in which the Carthage Bank was interested, and the railway agent did as Ross instructed in regard to shipping out the cotton, and a custom or usage had grown up by which Ross' order for the local bills, was equivalent to their actual delivery to said agent, so far as the Carthage Bank was concerned.   The appellant contends that the testimony shows conclusively that this usage induced and was responsible for the delivery by its agent of this cotton to McFadden Bros., without his first taking up the local bills.   The result was that McFadden's Agency got the cotton without paying plaintiff, and applied it to its claim of indebtedness against Ross.

The evidence of what was done by Ross in this regard is substantially as follows:   Rembert, the station agent, testified, "Mr. Vick was there and wanted to take the cotton on the platform.   I told them that I would have an understanding with Mr. Ross as to the bills of lading.  .  .  .   About ten o'clock Mr. Ross called me up from Carthage and told me to go ahead and let them take the cotton and everything would be all right.   I told them that .  .  .  the bills of lading were not at the bank and he would have to have them sent there to be delivered to me as before, and he would have to arrange with the bank at Carthage to send them down to me before I could let the cotton be worked up, or sign bills of lading for them.   He said he would arrange that, and about 12:30 he told me over the phone that he had been to the bank

and made arrangements to send me the bills of lading on the afternoon train, and they would instruct the bank at Timpson to notify me. In about twenty or thirty minutes Mr. Banks telephoned me to know if I would sign the through bills for Mr. Vick and let him go out on the two o'clock train. I told him Ross was not there and it was unusual and out of the way of handling this business, and that if he would guarantee to protect the road from any liability that might occur with reference to the bills of lading covering this cotton, that I would sign them. He came up there and I signed them. Colonel Banks asked me if there was any way to arrange it, and I asked him to tell Mr. Vick to come to the phone and I explained to him what I wanted to do. He said, 'All right, I will guarantee that everything is all right. I will guarantee to protect you from any damage that comes up.' Mr. Ross had always given me the local bills of lading. He had always been there except in this case. I always found them either in the Cotton Belt Bank or in his office."

W. E. Ross testified that Vick called him up over the phone at Carthage and asked to have the cotton released, that he wanted to get off on that evening's train, and that he told Vick he would do so and that he tried to get it released so that Vick could get off as desired, and that Vick knew it belonged to the Carthage Bank. Ross then went to the cashier of said bank to get the bank to guarantee the delivery of the bills, and the cashier said he would do so but he wanted the money and he told the cashier to telephone the Cotton Belt Bank at Timpson to guarantee delivery of the bills with the distinct understanding that the Carthage Bank was to get the money for that cotton. He testified also that he called up Mr. Rembert, the railway agent at Timpson, and told him that he had talked to the bank in Carthage and the bank had agreed to send the bills of lading down there that evening.

The cashier of the Carthage Bank testified that W. E. Ross came to him and he was anxious to make a delivery of the cotton that day, that the people who were going to buy were in Timpson and he could not make a delivery without the bills. "He asked me to phone to the Cotton Belt Bank to guarantee delivery on payment for the cotton, and I told him I would do so. I called up the bank and told them they could guarantee surrender of the bills of lading for 84 bales upon payment of the proceeds—not to be less than $2500. Eighty-four bales was the number mentioned. I do not know what became of the nine bales besides that. I told the bank that I would send the local bills of lading on the evening train, and I did send them down in pursuance of the conversation."

It is upon substantially the above testimony that it is contended that the railway company is not liable as a matter of law. Our opinion is that these assignments should be overruled. There would be foundation in this evidence for holding that the railway company was not liable to plaintiff if, as appellant contends, the railway delivered the cotton upon the request and order of Ross. The facts would disclose that Ross was plaintiff's representative, or was treated by plaintiff as its representative, in the matter of these

through shipments, in that his orders on the Cotton Belt Bank for the local bills were the equivalent of the surrender of the local bills, therefore if Ross had been present at Timpson and given such order in this instance, plaintiff may have been estopped to claim that the railway was liable.

The facts, however, are that Ross was not there, as had formerly been the case, and did not give an order on the Timpson Bank for the bills. According to the agent's own testimony, Ross had telephoned him that he had been to the bank at Carthage and made arrangements to send him the bills of lading on the afternoon train, and that the bank at Timpson would notify him. This was a different thing from a written order on the Timpson bank, which the agent was in the habit of presenting in order to get the bills. He recognized this, for he told Vick that it was unusual and out of the way of handling this business, and, notwithstanding the message from Ross, he refused to let Vick have the cotton except upon his guarantee. It is observed that the telephone message from Ross, which the agent testifies to, informed him that the Timpson Bank would notify him, yet he let the cotton go without even consulting that bank. It is clear that the procedure in this instance was not in accordance with the custom claimed; that the agent so regarded it and acted in the matter, not in reliance upon the custom, nor any order of Ross, but upon the guaranty.

The above conclusion disposes also of the fourth, fifth and sixth assignments. The court, however, did submit the issue to the jury, and there are assignments which raise questions relating to such charges. The fourth complains of a charge which was properly refused, because it would expressly have excluded consideration of the guaranty, and would have assumed that the procedure in this instance was in pursuance of a course of dealing. The same in regard to the fifth and sixth assignments.

The eighth assignment of error complains of a clause in the fourth paragraph of the court's charge, without regard to the other clauses of said paragraph. The proposition under the assignment is "that it was error for the court to limit the right of the railway company to a verdict, to express authority being given to W. E. Ross to receive the cotton when there was testimony of an implied authority." A reading of the entire paragraph shows that the court did not so limit it.

The ninth assignment is "that it was error for the court in a certain instruction to place upon defendant the burden to show that the railway's agent believed Ross had authority to make the delivery, if the jury found that Ross had authority." We have read the instruction which is set forth in the assignment of error and it does not deal with the burden of proof.

The tenth assignment presents a proposition that there was no evidence that the railway's agent knew that W. E. Ross had no authority to deliver the cotton in question. We overrule this as we think the evidence would support such a finding.

The eleventh complains of the following part of the charge: "It was the duty of the defendant, as a common carrier, when it re-

ceived the several shipments of cotton in controversy for delivery at Timpson, Texas, to deliver the cotton so shipped at said place to the First National Bank of Carthage or its order, as stipulated by its bill of lading." Appellant's proposition is that "the action was for damages on negligence, it was error to instruct that it was the duty of the railway company to make a delivery of the cotton whether negligent or not." The language occurs in the preliminary portion of the charge, and not in that part which submitted the case for the findings of the jury. The manner in which the case was submitted precludes the idea that the jury may have been misled by anything stated in the language quoted.

The twelfth is that the court erred in refusing to permit Rembert (the agent) to testify as follows: "Question: Would you have delivered the cotton in question to the Geo. H. McFadden & Bros. Agency upon the guaranty of said agency and after what Ross said to you over the telephone, if it had not been for the previous practice pertaining to the delivery of the cotton and the handling of cotton shipped from Carthage to Timpson, Texas, by W. E. Ross?" The answer would have been: "I would not have consented to make the delivery of this cotton except for the previous practice pertaining to the transportation and delivery of the cotton. But I signed the through bill of lading covering this cotton to McFadden Bros. Agency by reason of the guaranty made by them." In our opinion there was no error in the ruling for the reason already indicated, that the testimony which this agent gave shows conclusively that he was not willing at the time, and under the circumstances, to deliver the cotton by reason of any practice, and did so only because of the guaranty.

The seventh assignment complains of a portion of the charge which it sets forth, upon two grounds: First, because it assumed a matter of fact. We find that it did not assume it. Second, "Because the charge was upon the weight of the testimony in that it instructed the jury that the railway company was liable for the 93 bales of cotton, when it was a controverted fact as to whether or not more than 84 bales had been delivered to the Geo. H. McFadden & Bros. Agency." The charge did assume that the defendant railway company received the several shipments of cotton aggregating 93 bales, but it did not assume that that amount of cotton was delivered to the McFadden Agency.

Under the thirteenth, fourteenth and fifteenth assignments, appellant advances the following proposition: "The testimony showing that no objection was ever made to the previous delivery of the cotton, the court should have restricted the recovery in this case to 84 bales delivered on January 23, 1905, and as the jury returned a verdict for more than that amount, the court should have granted a new trial." It was undisputed that the local bills of lading showed 93 bales received by the railway company. There was evidence that plaintiff did not get any of the 93 bales, nor the proceeds thereof. A. M. West, a witness for McFadden & Bros. Agency, testified that the last turnout by Ross to the agency exceeded 84 bales. He testified to a statement rendered the agency

by the Timpson Bank referring to the bills of lading for 93 bales. There was, we think, evidence to sustain a finding that the 93 bales included in the local bill were delivered to McFadden & Bros. Agency.

The statement of facts in the record appears from the file mark to have been filed one day too late. But ample showing has been filed here that this occurred solely through the act of the judge, who labored under misapprehension of the date upon which the time limited expired; consequently we have considered the statement. Judgment affirmed.

*Affirmed.*

Writ of error refused.